Gustave G. Rosenberg, J.
Claimant’s application is for permission to file notice of claim pursuant to subdivision 5 of section 10 of the Court of Claims Act, which reads: “ But if the claimant shall be under legal disability, the claim may be presented within two years after such disability is removed.”
Claimant contends that this legal disability continued until final discharge from the hospital on June 19, 1967.
The State, in opposing the filing of the claim, contends:
1. That claimant, while in Central Islip Hospital, became a voluntary patient on April 18, 1966, and as such was under no legal disability.
2. That “ assuming, but not conceding the claimant was under disability until her release from the hospital on June 9, 1966, that such disability terminated on that date because she was placed on convalescent care and that the claimant was not under disability while on such convalescent care or status.”
On November 8, 1965 claimant, Marie Boland, was admitted to Central Islip Hospital, pursuant to an order of a Justice of the Supreme Court, New York County, and based upon the certificate of two physicians. On April 18, 1966 the claimant, while still a patient at this hospital, signed a paper designated as “Application for Hospitalization”, which the State claims made her a voluntary patient in this hospital, which hospital is strictly one for the care and treatment of those who are mentally ill.
On June 9, 1966 the claimant was released from the Central Islip Hospital, but not discharged. She was placed under what is known as “ convalescent status ”, with a discharge diagnosis of “Schizophrenia, Paranoid. Improved”.
Upon admission to Central Islip Hospital and upon the date THAT CONVALESCENT STATUS WAS RECOMMENDED, AND UPON FINAL DISCHARGE FROM CONVALESCENT CARE AND FROM THE HOSPITAL, the *804 diagnosis was the same, to wit: Schizophrenia, Paranoid, except for the additional finding of “ Improved ”, upon discharge.
In her claim herein, claimant alleges, among other things, that she was falsely certified to Central Islip State Hospital on November 8, 1965 as being mentally ill and in need of hospitalization, and for having been illegally detained in said institution from November 8, 1965 to and including June 9, 1966, on an invalid order of certification, and for the negligence of the doctors of the staff of said hospital in departing from the usual and properly approved methods of diagnosing and treating alleged mental illness. She further claims that she was under the jurisdiction of the State Department of Mental Hygiene and subject to its order and control up to and including her final discharge from the “After-Care Clinic” of said department and by Central Islip Hospital on June 19, 1967.
The first question raised is whether the claimant was or was not under legal disability while a patient in Central Islip Hospital as a “ voluntary patient ”. I shall not for the purposes of determining this motion consider the defense raised by the claimant, to wit: that she was forced or compelled to change her status from that of “ involuntary ” to “ voluntary ” status. I find no difficulty in determining that she was indeed under a legal disability within the meaning of the law, and particularly within the meaning of subdivision 5 of section 10 of the Court of Claims Act, at the time she was actually confined to the institution and under their complete control and in their detention.
As is emphasized by the claimant, she was committed or certified to Central Islip Hospital by the order of a Supreme Court Justice of this State on November 3, 1965, for a period not to exceed six months. Pursuant to said order, based on the certificate of two physicians, the court found claimant to be mentally ill and in need of hospital care and treatment, and she was admitted on November 8, 1965. Although the six months’ period authorized by said court order expired on May 8, 1966, she was not released then nor was she released until June 9, 1966. She states further that, if she was in truth and in fact a voluntary patient on April 18, 1966, why did not the hospital release her then; and what authority did it have to keep her confined until June 9, 1966? Further, what was its authority to order her on convalescent care and to keep her in that classification until her final discharge on June 19, 1967?
There is no question that she was in the institution pursuant to an order of Justice George Tilzeb of the State Supreme *805 Court, and, until discharged by the hospital, the judicial determination was in force and effect.
As was ably stated by Justice Benjamin Brenner in People ex rel. Kaminstein v. Brooklyn State Hosp. (49 Misc 2d 57, 62), “ A person who is alleged to be mentally ill and who meekly submits to the authorized pressure for voluntary status or is unaware of his right to resist that pressure deserves, even the more, the protective arms of the law.” (See Matter of Buttonow, 52 Misc 2d 687.)
The second problem raised, a more troublesome one, is whether the claimant’s legal disability terminated upon release from the institution for convalescent status or upon discharge from such convalescent status and ultimate final discharge by the hospital. We are well aware of the acute need for beds in all of our hospitals. There comes a time when in the opinion of the hospital it is wise and necessary to release some of the patients to outpatient or convalescent status. The introduction of miracle drugs has allowed such early release on convalescent status of “ improved patients ” from our State mental institutions. Such men and women gain simple dignity of living among friends and family while the State is allowed an opportunity to help still others through its admittedly limited facilities. The progress of such outpatients, when properly supervised, has been remarkable. Yet the result of improper supervision has too often been tragic. The growing number of outpatients whose continued progress depends so heavily upon the continued use of such medication underscores the need for proper aftercare treatment, supervision, and control.
It is apparent from the above, that while the changed status of these patients, as in the claimant’s case, necessitates a corresponding change in the degree of said supervision and control, the State’s basic responsibilities endure.
As was stated in Matter of Griffiths v. Shaffrey (8 A D 2d 892): “ Subdivision 3 of section 87 of the Mental Hygiene Law provides for the granting of convalescent status to patients who remain mentally ill, but who are not considered dangerous. The care of a patient in such status may be entrusted to relatives or other persons. The status mat be revoked by the dibecto'r at any time. Claimant has not been discharged and is still a mentally ILL PERSON AND IS UNDER THE DIRECT SUPERVISION OF THE hospital.” (Emphasis supplied.) See Lee v. State of New York, 187 Misc. 268; Danna v. State of New York, 207 Misc. 505.)
Subdivision 12 of section 34 of the Mental Hygiene Law states: ‘1 The director of an institution in the department * *" * may make arrangement with suitable families for the *806 care * * * and treatment of patients * * *. Patients so placed in family care shall be those on conditional release because they do not require active mental hospital care and treatment * * * but any patient so placed in family care shall be returned to the institution at any time upon order of the director 5
In the instant case, the claimant was placed on convalescent status in her own custody and directed to attend the Lower Manhattan After-Care Clinic. At that time she was given a supply of tofranil, an antidepressant,- and thorazine, a tranquilizer. She attended the clinic periodically.
The only surviving member of her family was a brother, who himself had been a patient at Central Islip Hospital.
Since subdivision 5 -of section 10 of the Court of Claims Act does not define the term 1 ‘ legal disability ’ ’ and since as shown, while on community status a person is under the direct supervision of the hospital whose Director may revoke the status at any time, I do not believe that it should be necessary on an application of this nature for the court to determine the wisdom of the hospital authorities in placing the claimant on community status, or to determine the extent of the mental illness at such time. The clear fact is that the claimant was still mentally ill at the time she was placed on community status according to the diagnosis. Such a person, with such illness, using administered drugs, both for depression and agitation, and subject to periodic attendance at an aftercare clinic is certainly under a heavy disability and burden. Until final discharge from the aftercare clinic and their recommendation to the hospital that she be discharged by them, she is not completely well, nor can she be expected to exercise that freedom of action, or have the understanding needed to be aware of what she is doing or should do.
Accordingly and under the circumstances, justice and equity dictate a finding that claimant should be afforded the right of legal disability within the meaning of subdivision 5 of section 10 at the Court of Claims Act until the final discharge by the Director of the mental institution which had originally assigned her to the aftercare clinic.
The motion to file the claim as timely is hereby granted.
The notice of claim attached to the claimant’s moving papers will be considered as filed and claimant is to file the necessary 12 copies of the claim with the Clerk of the court within 10 days from the date of entry of the order.